<u>**NOT FOR PUBLICATION**</u>

**<u>UNITED STATES DISTRICT COURT</u>**
**<u>FOR THE DISTRICT OF NEW JERSEY</u>**

| | |
|---|---|
| _____ : | |
| DOROTHY POPLAR LAPLACE and LISA : | |
| J. LAPLACE SMITH, as Co-Executrixes : | |
| of the Estate of Maurice Leonard Laplace, : | |
| and on behalf of L.J. & M. LAPLACE, : | Civil Action No. 03-4291 (JAG) |
| New Jersey General Partnership, : | |
| : | **OPINION** |
| : | |
| Plaintiffs, : | |
| : | |
| v. : | |
| : | |
| SANIEL LAPLACE, : | |
| : | |
| Defendant. : | |
| _____: | |

**<u>GREENAWAY, JR., U.S.D.J.</u>**

This matter comes before the Court on Defendant Saniel Laplace's ("Defendant") motion

to dismiss Plaintiffs' Amended Complaint or in the alternative, for summary judgment,[1] and

Plaintiffs' Dorothy Poplar Laplace and Lisa J. Laplace Smith (collectively, "Plaintiffs") motion

for partial summary judgment,[2] pursuant to FED. R. CIV. P. 12(b)(6) and FED. R. CIV. P. 56(c)

respectively.  On August 26, 2005, United States Magistrate Judge G. Donald Haneke issued a

---

[1]This Court will consider Defendant's motion to dismiss as a motion for summary judgment, pursuant to FED. R. CIV. P. 56(c).  FED. R. CIV. P. 12(c) provides that a court shall treat a motion to dismiss as a motion for summary judgment when matters outside the pleadings are presented to, and not excluded by, the court.  Here, that prerequisite has been met.

[2]Plaintiffs' motion should have been styled as a cross-motion for partial summary judgment, pursuant to L. CIV. R. 7.1(h).

Report and Recommendation ("R&R"), pursuant to FED. R. CIV. P. 72(b) and L. CIV. R.

72.1(a)(2).  In that R&R he recommended that this Court: (1) deny Plaintiffs' motion for partial

summary judgment; and (2) deny Defendant's motion for summary judgment.[3]  The parties both

filed timely objections to the R&R.  Defendant objected to the R&R on the basis that the R&R

failed to address affirmatively Defendant's motion for summary judgment "to dismiss Counts,

[sic] One, Two and Three," of Plaintiffs' Amended Complaint.  Plaintiffs objected to the R&R

on the basis that the R&R failed to address Plaintiffs' argument that a fixed sum buyout

provision is unenforceable under New Jersey Partnership law and on public policy grounds,[4] and

the R&R errs in its analysis of the waiver, estoppel, and contract modification issues.

As a result of this Court's <u>de novo</u> review of the R&R, the parties objections and

---

[3]Based on the submission of affidavits by both parties, Judge Haneke considered Defendant's motion to dismiss as a motion for summary judgment.  (R&R at 4-5.)  The R&R made the following findings: (1) Defendant's argument that the parties' dispute must be submitted to arbitration on the one hand, yet, need not be submitted to arbitration on the other, (because language in the parties' partnership agreement made certain sections "forever binding" upon the parties), was without merit (R&R at 6-8); (2) the dispute should not be submitted to arbitration because language in the partnership agreement specifically states that "no submission to arbitration shall take place after the death of any of the parties has occurred" and Plaintiffs are entitled to a forum for their grievances because a "forum preclusion" clause is unenforceable as against public policy (R&R at 8-9); (3) Plaintiffs' argument that the parties had engaged in a course of conduct that effectively modified the partnership agreement's buyout clause was not persuasive because (with the exception of one alleged modification of the buyout provision) all of the modifications to the buyout provision were written, in accordance with the partnership agreement (R&R at 9-11); and (4) Plaintiffs' argument that the partners intended there to be a distinction between the real property owned by the partnership and the other assets of the partnership was without merit because "[i]f the Partners had intended to exclude the real estate of the Partnership from the 'partnership interest,' there would have been a clear indication in the 1959 Partnership Agreement."  (R&R at 11-12.)

[4]Plaintiffs have raised a public policy argument asserting that New Jersey law is clear that a contractual provision that undermines a statutory requirement is contrary to public policy, and is therefore void and unenforceable.  This argument fails for the reasons set forth in section A of the Discussion, <u>infra</u>.

submissions, the R&R will not be adopted.  This Court concludes that Defendant's motion for summary judgment should be granted, and Plaintiffs' motion for partial summary judgment should be denied, for the reasons set forth in this Opinion.

## BACKGROUND

During the 1930's, brothers Oscar Laplace ("Oscar") and Louis J. Laplace ("Louis"), founded LJM, a chemical manufacturing and distribution business.  (Pls.' Statement of Undisputed Material Facts ¶ 2 ("Pls.' Statement"); Amended Complaint dated June 18, 2004 ("Am. Compl."), at ¶ 9.)  Maurice Laplace ("Maurice"), Saniel Laplace ("Saniel" or "Defendant"), and Oscar B. Laplace ("Oscar B.") were the sons of Louis and the nephews of Oscar.  (Pls.' Statement ¶ 4.)  In August 1959, Louis and Oscar, along with Louis' three sons, Maurice, Saniel, and Oscar B., formalized their existing business relationship by entering into the 1959 Partnership Agreement (the "Agreement").  (Pls.' Statement ¶¶ 4-5; Certification of Saniel Laplace dated October 17, 2005 ("Saniel Cert."), at ¶¶ 4-5, Ex. B; see also Affidavit of Richard D. Wilkinson dated November 18, 2004 ("Wilkinson Aff."), at ¶ 2, Ex. A.)  LJM is a New Jersey general partnership, with its principal place of business located on Leliart's[5] Lane in Elmwood Park, New Jersey, on property owned by the partnership.  (Saniel Cert. ¶¶ 1, 3; Wilkinson Aff. ¶ 19, Ex. R.)  LJM also owns a vacant parcel of land adjacent to their office.  (Pls.' Statement ¶¶ 20-21; Wilkinson Aff. ¶ 19, Ex. R.)

The Agreement states the rights and obligations of the parties as to each other and the

---

[5]Throughout the pleadings, motions, and accompanying documents, "Leliart's," is spelled both with, and without, the apostrophe.

partnership.[6]  (Saniel Cert. ¶ 5, Ex. B; Wilkinson Aff. ¶ 2, Ex. A.)  Specifically, and for the

purposes of this lawsuit, the Agreement contains clauses which relate to a party's interest in the

partnership upon death (Paragraph 11)[7] and the submission of disputes to arbitration (Paragraph

13).  (Saniel Cert. ¶¶ 11, 16; Wilkinson Aff. ¶ 2, Ex. A.)  After signing the Agreement, over time,

various partners of LJM have taken ill, retired, or died.  (Pls.' Statement ¶¶ 8-11, 16; Saniel Cert.

¶¶ 7-8.)  The departing partners or their estates have received differing amounts of money for

their partnership interest.  (Pls.' Statement ¶¶ 8-11, 16.)  When Oscar B. died in February 1986,

Maurice and Saniel were left as the only remaining partners of LJM.  (Pls.' Statement ¶¶ 16-17;

Saniel Cert. ¶ 7.)  In March of 2002, Maurice was diagnosed with advanced-stage cancer.  (Pls.'

Statement ¶ 18; Saniel Cert. ¶ 9.)  Maurice died in February 2003 (Pls.' Statement ¶ 18; Saniel

Cert. ¶ 9) and Plaintiffs are the co-executrixes of his estate.  (Am. Compl. ¶ 18.)

Plaintiffs initially filed a two-count Complaint, on September 11, 2003, alleging that the

Agreement's buyout provision was unenforceable under the revised New Jersey Uniform

Partnership Act (1996) (hereinafter "RUPA"), N.J. Stat. Ann. § 42:1A-1 to 42:1A-56 (2005).[8]

---

[6]There is no dispute as to whether the Agreement was executed by all parties.

[7]Paragraph 11(a) includes a $100,000 buyout provision for a deceased party's partnership interest.  (See Wilkinson Aff. ¶ 2, Ex. A at 5-6.)  Regarding the figure stated in the buyout provision, Plaintiffs allege that it was based on a perceived value of the Partnership business of $500,000 at the time of the Agreement.  (Am. Compl. ¶ 13.)  Defendant vehemently contests this theory, and states that in fact, at the time of the Agreement, the business wasn't prosperous and $100,000 (a figure determined by Louis, and agreed to by all the partners) was a tremendous amount of money.  (Saniel Laplace Dep. April 2, 2004, attached as Ex. B to Wilkinson Aff. ("Saniel Dep. Ex. B") at 39:15-25; 40:1-25; 41:1-25; 42:1-4.)  No evidence has been presented to substantiate Plaintiffs' allegation.

[8]Originally, Plaintiffs also demanded a formal accounting.  The Amended Complaint does not include this demand.

Defendant filed his answer and counterclaim to the initial complaint on November 14,

Plaintiffs amended their Complaint on June 18, 2004, to assert an additional ground for not

enforcing the buyout provision.  In the Amended Complaint, Plaintiffs essentially state three

causes of action, namely:

1.      a request for a declaration that "Paragraph 11 of the Agreement is void as contrary

        to N.J.S.A. 42:1A-34" and for a determination of "the fair value of Maurice's 50

        percent partnership interest in LJM in accordance with N.J.S.A. 42:1A-34(b)[,]"

        (Am. Compl. ¶ 28(1), (2)) (Pls.' Count One);

2.      a request for "[a] declaratory judgment determining that the $100,000 purchase

        price set forth in Paragraph 11 of the Agreement does not apply to the underlying

        real estate of LJM" and for a determination of "the fair value of Maurice's 50

        percent interest in the real estate of LJM in accordance with N.J.S.A. 42:1A-

        34(b)[,]" (Am. Compl. ¶ 32(1) , (2)) (Pls.' Count Two);

3.      a request for a determination of "the fair value of Maurice's 50 percent

        partnership interest in the business and real estate of LJM in accordance with

        N.J.S.A. 42:1A-34(b)" because "Saniel has waived any right to enforce Paragraph

---

2003, and an amended answer and counterclaim to the initial complaint on November 21, 2003.
Defendant essentially stated four assertions in his amended answer and counterclaim: 1) the
complaint should be dismissed for failure to abide by the arbitration provisions in the Agreement,
and the Court should issue an order dissolving the partnership; 2) Defendant is entitled to
attorney's fees and costs because Plaintiffs' action is frivolous, and in violation of N.J. STAT.
ANN. 2A:15-59.1; 3) the Court should issue a judgment declaring that Plaintiffs are "estopped
from voiding or canceling the Agreement based on principals [sic] of equitable or promissory
estoppel;" and 4) pursuant to the terms of the Agreement, Maurice's estate "owes the partnership
or Saniel Laplace as the sole surviving partner, the sum of $161,321.00 for overdrafts of the
capital account of Maurice Laplace."  (See Def.'s Am. Answer to Compl. attached as Ex. J to
Wilkinson Aff. ("Def.'s Am. Answer") at ¶ 11, Count One ¶ 12, Count Two ¶ 2, Count Three ¶
4, Count Four ¶ 2.)  Defendant's answer to Plaintiffs' Amended Complaint, filed July 8, 2004,
however, is devoid of counterclaims.

11 against the estate of Maurice by reason of a pattern of [a] decades-long course of conduct" (Am. Compl. ¶ 43(2), ¶ 34.) (Pls.' Count Three)[9]

In essence, Plaintiffs claim: (1) that Paragraph 11 of the Agreement is unenforceable under RUPA (Pls.' Count One); (2) that if the buyout provision is enforceable, it only applies to LJM's operating business and not to the underlying real estate of the partnership (Pls.' Count Two); and (3) that even if RUPA does not govern Paragraph 11 of the Agreement, the buyout provision was modified, waived, or is equitably estopped by the course of the parties' conduct over a more than forty year period (Pls.' Count Three).

Plaintiffs have requested that Defendant repurchase Maurice's alleged fifty percent partnership interest in LJM at its fair market value (in accordance with RUPA), which they allege is approximately $3.5 million.[10]   (Am. Compl. ¶ 1.)  Defendant rejected this request and moved to dismiss Plaintiffs' Amended Complaint, or in the alternative, for summary judgment seeking enforcement of the $100,000 fixed-sum buyout provision of the Agreement on the following grounds: (1) RUPA does not govern Paragraph 11 of the Agreement; (2) the underlying real estate of the partnership forms part of a partner's interest in the partnership; and (3) the conduct

_____

[9]In addition, each count of Plaintiffs' Amended Complaint includes: 1) a request for an order requiring "Saniel to pay said fair value to Plaintiffs, together with pre- and post-judgment interest, costs, reasonable attorneys' fees and fees and expenses of any appraisers or experts" (Am. Compl. ¶ 28(3), ¶ 32(3), ¶ 43(3)); and 2) a request for an order requiring "Saniel to indemnify the estate of Maurice against any and all partnership liabilities and obligations of LJM, whether incurred before or after the date of Maurice's dissociation from LJM, pursuant to N.J.S.A. 42:1A-34 (d), including but not limited to the aforesaid potential environmental liability"  (Am. Compl. ¶ 28(4), ¶ 32(4), ¶ 43(4).)

[10]According to Plaintiffs' submissions, this estimate does not include the value of the partnership's underlying real estate.  Plaintiffs claim that one parcel is already under contract for $2.335 million and that an offer of $1,950,000 has been received on the other parcel.  (Pls.' Statement ¶¶ 20-21; Wilkinson Aff. ¶¶ 15-16, Exs. N-O.)

of the parties could not constitute modification or waiver of Paragraph 11 of the Agreement because the modifications were in writing.  (Def.'s Br. in Supp. of Mot. to Dismiss or for Summ. J. 7-10.)  Defendant's motion also includes an arbitration demand (e.g., Defendant argues that pursuant to the Agreement, the only proper forum for partnership disputes is arbitration).[11] (Def.'s Br. in Supp. of Mot. to Dismiss or for Summ. J. 10-11.)

In response, Plaintiffs moved for partial summary judgment, seeking a determination that the Agreement's buyout provision is unenforceable, and that arbitration is prohibited under the circumstances.[12]  (Pls.' Br. in Supp. of Mot. for Partial Summ. J. 1.)  In his opposition, Defendant contends that the Agreement is enforceable as written, because the conduct of the partners over the years demonstrates their desire to abide by the Agreement.  (Def.'s Br. in Opp'n to Pls.' Mot. for Partial Summ. J. 9.)  Since Plaintiffs commenced this action, Defendant has not paid Plaintiffs any amount of money for Maurice's partnership interest.  (Am. Compl. ¶ 21; see also Saniel Cert. ¶ 15.)[13]

---

[11]However, Defendant did not raise this issue as a counterclaim in his answer to the Amended Complaint.

[12]In their motion for partial summary judgment, Plaintiffs state that "[e]arly on, the parties agreed to bifurcate liability and damages, in order to postpone discovery or expert testimony with respect to the fair value of Maurice's partnership interest until the Court first decides whether the $100,000 buyout provision is unenforceable."  (Pls.' Br. in Supp. of Mot. for Partial Summ. J. 5.) Apparently, the agreement alluded to was not committed to writing.

[13]On April 23, 2003, Mr. James Biggins, LJM's certified public accountant, advised Defendant in writing that there was a negative balance in Maurice's capital account of $261,321.00.  (Certification of Saniel Laplace dated October 17, 2005 ("Saniel Cert."), at ¶ 15.) The letter from Mr. Biggins was forwarded to Plaintiffs' attorney on April 25, 2003.  (Id.)  This Court notes that the letter from Mr. Biggins was improperly attached to the back of Defendant's Exhibit B, instead of being attached separately (as indicated by ¶ 15 of the Certification) as Exhibit C.

## LEGAL STANDARDS

### A.    Standard of Review

A magistrate judge's recommended disposition of a dispositive motion is subject to de novo review.  In re U.S. Healthcare, 159 F.3d 142, 145-46 (3d Cir. 1998); Temptations, Inc. v. Wager, 26 F. Supp. 2d 740, 743 (D.N.J. 1998).  See also FED. R. CIV. P. 72(b).

### B.    Standard for Summary Judgment Under FED. R. CIV. P. 56(c)

Summary judgment is appropriate where the moving party establishes that "there is no genuine issue as to any material fact and that [it] is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c).  A factual dispute between the parties will not defeat a motion for summary judgment unless it is both genuine and material.  See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986).  A factual dispute is genuine if a reasonable jury could return a verdict for the non-movant and it is material if, under the substantive law, it would affect the outcome of the suit.  See Anderson, 477 U.S. at 248.  The moving party must show that, if the evidentiary material of record were reduced to admissible evidence in court, it would be insufficient to permit the non-moving party to carry its burden of proof.  See Celotex v. Catrett, 477 U.S. 317, 318 (1986).

Once the moving party has carried its burden under Rule 56, "its opponent must do more than simply show that there is some metaphysical doubt as to the material facts in question." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).  The opposing party must set forth specific facts showing a genuine issue for trial and may not rest upon the mere allegations or denials of its pleadings.  See Sound Ship Bldg. Co. v. Bethlehem Steel Co., 533 F.2d 96, 99 (3d Cir. 1976), cert. denied, 429 U.S. 860 (1976).  At the summary judgment

stage, the court's function is not to weigh the evidence and determine the truth of the matter, but rather to determine whether there is a genuine issue for trial.  See Anderson, 477 U.S. at 249.  In doing so, the court must construe the facts and inferences in the light most favorable to the non-moving party.  See Wahl v. Rexnord Inc., 624 F.2d 1169, 1181 (3d Cir. 1980).

## DISCUSSION

Defendant asserts that he is entitled to summary judgment, pursuant to Rule 56 of the Federal Rules of Civil Procedure, on the following grounds: (1) Paragraph 11 of the Agreement is enforceable under the correct interpretation of RUPA; (2) the parties intended for a "party's interest in the partnership" to include the partnership's underlying real estate (Wilkinson Aff. ¶ 2, Ex. A at 6); (3) the parties did not modify or waive the Agreement by their course of conduct; and (4) in accordance with the Agreement, the parties' dispute must be submitted to arbitration.[14]

---

[14]Defendant's arbitration demand is not part of the pleadings filed in response to the Amended Complaint.  Defendant failed to include a counterclaim on this ground in his Answer to the Amended Complaint.  (See Def.'s Answer to Am. Compl. attached as Ex. L to Wilkinson Aff. ("Def.'s Answer") at ¶ 13.)  Defendant cannot now assert a counterclaim in his motion for summary judgment.  Nonetheless, Plaintiffs have moved for partial summary judgment in response to Defendant's attempt to assert a counterclaim in his motion for summary judgment.  Even if the pleadings had raised this claim, it would be denied, because in accordance with the language of Paragraph 13 of the Agreement, this dispute cannot be submitted to arbitration.  Paragraph 13 of the Agreement states in relevant part:

> In the event any dispute shall arise between the parties hereto, in connection with the operation and conduct of the business of the partnership, or if any dispute arises with respect to any of the terms and conditions of this agreement, or with the interpretation thereof, or with respect to any other matter or thing effecting [sic] the interests of the parties in the partnership, or the partnership business, then such dispute shall be submitted to arbitration to the American Arbitration Association.
> It is understood and agreed, however, that the only matters that may not be submitted to arbitration, and which shall be arbitrarily and forever binding upon the parties hereto, shall be those matters contained in Article "11.", [sic] and its various subdivisions thereof, and Article "12 ", and its various subdivisions

Plaintiffs assert that they are entitled to partial summary judgment, pursuant to Rule 56 of the Federal Rules of Civil Procedure, on the following grounds: (1) the buyout provision in Paragraph 11(a) is unenforceable under RUPA (Pls.' Count One); (2) the buyout provision in Paragraph 11(a) does not encompass the partnership's underlying real estate as part of a "party's interest in the partnership" (Wilkinson Aff. ¶ 2, Ex. A at 6) (Pls.' Count Two); (3) the parties modified or waived Paragraph 11 by their course of conduct (Pls.' Count Three); and (4) the Agreement specifically prohibits arbitration after the death of a party to the Agreement.[15]

Upon review of the parties' submissions, this Court grants Defendant's motion for summary judgment on Counts One, Two, and Three of Plaintiffs' Amended Complaint. Plaintiffs' motion seeking partial summary judgment is denied.

### A.   RUPA's Application to Paragraph 11 of the Agreement

The General Provisions of RUPA define "Partnership" as "an association of two or more

_____

thereof, except where reference is made therein for submission to arbitration, ***the understanding being that no submission to arbitration shall take place after the death of any of the parties has occurred***.

(Wilkinson Aff. ¶ 2, Ex. A at 12-13 (emphasis added.))

Paragraph 13 of the Agreement clearly states that no dispute shall be submitted to arbitration after the death of any party. As Defendant is the only surviving party to the Agreement, this matter, by its own terms, cannot be submitted to arbitration. Although the arguments Plaintiffs present in their motion for partial summary judgment have apparent merit, Plaintiffs cannot be granted summary judgment on a non-existent claim. Therefore, that part of Plaintiffs' motion for partial summary judgment focused on Defendant's arbitration demand is rendered moot.


[15]This Court notes that in contrast to Plaintiffs' approach to Paragraph 11, here, Plaintiffs are more than willing to abide by the Agreement. Nonetheless, this ground is moot. See supra note 14.

persons to carry on as co-owners a business for profit formed under section 10 of this act, predecessor law, or comparable law of another jurisdiction."  N.J. STAT. ANN. § 42:1A-2 (2005) (internal footnotes omitted).[16]

First, Plaintiffs argue, and Defendant does not contest, that RUPA could apply to LJM, as the partnership was formed under predecessor law, namely, the prior Uniform Partnership Act adopted in 1919.  N.J. STAT. ANN. § 42:1-1 (1919) (repealed by N.J. STAT. ANN. § 42:1A-1 to 42:1A-56 (1996); Pls.' Br. in Supp. of Mot. for Partial Summ. J. 20.)  Second, Plaintiffs argue that Article 7 of RUPA ("Partner's Dissociation When Business Not Wound Up")[17] governs the rights and obligations of the partners in LJM and requires that Defendant pay Plaintiffs a buyout price equivalent to the fair value of Maurice's interest in the partnership,[18] as of the date of his withdrawal, (in this case, his death), in accordance with sections 34(a), and (b) of Article 7,

---

[16]Pursuant to RUPA's definition, Plaintiffs contend, and Defendant does not dispute, that Maurice's estate remains a partner in the Partnership by operation of law.  (Pls.' Resp. to Def.'s Statement of Undisputed Material Facts ¶ 1; Pls.' Br. in Supp. of Mot. for Partial Summ. J. 21.)

[17]Article 7, section 34, states in relevant part:

a.  If a partner is dissociated from a partnership without resulting in a dissolution and winding up of the partnership business under section 39 of this act, except as otherwise provided in the partnership agreement, the partnership shall cause the dissociated partner's interest in the partnership to be purchased for a buyout price as determined pursuant to subsection b. of this section.

b.  As used in subsection a. of this section, "buyout price" means the fair value as of the date of withdrawal based upon the right to share in distributions from the partnership unless the partnership agreement provides for another fair value fomula.

N.J. STAT. ANN. § 42:1A-34 (2005) (internal footnote omitted).

[18]Regarding the "fair value" of the Partnership, Plaintiffs allege that Maurice's fifty percent interest in the partnership entitles his estate to approximately $1.75 million, based on an estimated value of the partnership's operating business of $3.5 million.  (Am. Compl. ¶ 1.)

thereby invalidating Paragraph 11(a) of the Agreement.[19]

Defendant argues that Plaintiffs have erred in their reading of RUPA.  Defendant asserts that Article 7 does not apply to Paragraph 11 of the Agreement, because in accordance with the language of Article 1, section 4(a), RUPA would only govern the relations between the partners and the partnership, where the partnership agreement does not otherwise provide.  RUPA, Article 1, section 4(a), states:

Except as otherwise provided in subsection b. of this section,[20] ***relations among***

---

[19]Paragraph 11 of the Agreement states in relevant part:

In the event of the death of any of the parties hereto, during the term of this agreement and the continuance of the partnership, the surviving parties shall purchase from the estate of such deceased party, and the estate of such deceased party shall sell to the surviving parties, the interest of such deceased party in and to the partnership business, at a price and under terms and conditions as hereinafter provided for:

a)  Notwithstanding any value of the capital account, or the value of the capital account plus accrued profits to the date of death of such deceased party, as same may be reflected by the books of the partnership, the surviving parties shall pay to the estate of the deceased party, and the estate of th e [sic] deceased party shall accept as payment in full and as the purchase price for such deceased party's interest in the partnership, the sum of $100,000.00, subject to the adjustment hereinafter provided [as set forth in 11(b)] . . . .

b) The aforesaid purchase price may be adjusted upwards or downwards in the event that there have been overdrafts against the capital account, or against prospective profits made by any of the parties hereto and as will be reflected on the books of the partnership as of the date of death of such deceased party.  In the event any such adjustments shall be necessary, same shall be certified to by the Certified Public Accountant then in the employ of the partnership and his certification as to the amount and manner of such adjustments shall be binding on the parties hereto and their respective heirs, administrators and executors.

(Wilkinson Aff. ¶ 2, Ex. A at 5-7.)

[20]Subsection b. is not at issue in this matter.

*the partners and between the partners and the partnership are governed by the partnership agreement. To the extent the partnership agreement does not otherwise provide, this act governs* relations among the partners and between the partners and the partnership.

N.J. STAT. ANN. § 42:1A-4(a) (2005) (emphasis added).

Neither party disputes that the Agreement provides a buyout provision in the event of a partner's death. Rather, Defendant argues that because the Agreement provides a buyout provision and RUPA explicitly states that relations "between the partners and the partnership are governed by the partnership agreement," the buyout provision is enforceable.[21] N.J. STAT. ANN. § 42:1A-4(a) (2005). Plaintiffs argue that section 34(a) of Article 7 of RUPA, not section 4(a), governs Paragraph 11 of the Agreement, because a partner has died, but the business has not been "wound up." They argue that pursuant to section 34(a) of Article 7, the buyout provision is unenforceable.

The parties' dispute is essentially a legal question regarding the correct interpretation of RUPA. The only fact that needs to be considered here, with respect to interpreting or applying the statute, is whether the parties to the Agreement contemplated, and provided for, the eventuality of a partner's death, in the Agreement. Paragraph 11 of the Agreement clearly demonstrates that they did. In accordance with section 4(a) of Article 1 of RUPA, RUPA does not govern Paragraph 11 of the Agreement because the Agreement has provided a provision in the event of a partners' death. The Agreement is clear and unequivocal. The parties are bound to abide by the buyout provision provided in Paragraph 11(a).

---

[21]Apparently in reference to Paragraph 11(b), Defendant submits that Maurice had a negative balance in his capital account of $261,321 at the time of his death, and states that "according to the agreement no payment is due to the Estate." (Saniel Cert. ¶¶ 14-15; see supra note 13.)

Defendant has carried his burden as the moving party, and demonstrated that there is no genuine issue as to a material fact for the jury to resolve regarding the applicability of RUPA to the buyout provision in Paragraph 11 of the Agreement, nor does a dispute arise as to the correct interpretation of RUPA.  Plaintiffs have failed to point to anything in the record that creates a genuine issue as to a material fact regarding whether the buyout provision is at odds with the application of RUPA.  Defendant is entitled to summary judgment as a matter of law on Count One of Plaintiffs' Amended Complaint.  See FED. R. CIV. P. 56.

**B.     General Principles of Contract Interpretation**

The primary function of the Court when interpreting an agreement is to ascertain the intention of the parties as it was at the time the agreement was executed.  11 RICHARD A. LORD, WILLISTON ON CONTRACTS § 30:2 at 16-20 (4th ed. 1999) ("WILLISTON ON CONTRACTS"); see also U.S. v. Moorman, 338 U.S. 457 (1950); Williams v. Metzler,132 F.3d 937, 947 (3d Cir. 1997) ("In the process of interpreting a contract, the court seeks to ascertain the intent of the parties.")  The Court should embody the perspective of the parties, looking forward from the date when they entered into the agreement, instead of viewing the agreement from a position of hindsight.  11 WILLISTON ON CONTRACTS § 31:9 at 340-41; Coca-Cola Bottling Co. of Shreveport, Inc. v. Coca-Cola Co., 769 F. Supp. 671, 706 (D. Del. 1991), aff'd, 988 F.2d 414 (3d Cir. 1993).  This perspective is especially important when interpreting perpetual agreements long after they were entered into.  See Coca-Cola Bottling Co., 769 F. Supp. at 706.  In this context, the Court must resist the temptation to conform the agreement to modern circumstances by adding terms not assented to originally.  Id.

The Court should place the greatest weight on the express terms of the agreement,

14

RESTATEMENT (SECOND) OF CONTRACTS § 203(b) (1981); see also United States v. Armour & Co., 402 U.S. 673, 678-79 (1971), as the language itself is the best and most important evidence of the intention of the parties.  11 WILLISTON ON CONTRACTS § 32:2 at 402 ("The parties' intentions are, first and foremost, determined by the language used in their agreement.").  An agreement should be read and interpreted as a whole.  11 WILLISTON ON CONTRACTS § 32:5 at 420-21; RESTATEMENT (SECOND) OF CONTRACTS § 202(2) (1981).

Although a Court may look to course of performance or prior course of dealing, primary importance should be placed upon the express terms of the agreement.  RESTATEMENT (SECOND) OF CONTRACTS § 203(b) (1981) ("express terms are given greater weight than course of performance [or] course of dealing"); see also E. ALLAN FARNSWORTH, CONTRACTS § 7.13 at 469-73 (4th ed. 2004) ("FARNSWORTH").[22]  Extrinsic evidence of the intent of the parties to the agreement is secondary to the actual language of the agreement.  See Coca-Cola Bottling Co., 769 F. Supp. at 706; RESTATEMENT (SECOND) OF CONTRACTS § 203(b) (1981).

It is a "well-established principle that it is not the function of the judiciary to change the obligations of an [agreement] which the parties have seen fit to make."  11 WILLISTON ON CONTRACTS § 31:5 at 298-99.  A Court must not rewrite the agreement for the parties.  Id. at 299. When applying the principles of contract interpretation, the Court "may not delete contractual

---

[22]Farnsworth discusses the Uniform Commercial Code's (the "Code") important provision on course of performance and states that its principles extend by analogy to all noncommercial contracts.  FARNSWORTH, CONTRACTS § 7.13 at 469-70.  Under the Code, the express terms of an agreement and any applicable course of performance must be construed whenever reasonable, as consistent with each other.  Id. at 474.  "If such an interpretation is unreasonable, the Code establishes a hierarchy in which express terms prevail over . . . course of performance . . . .  Thus, evidence will only be admitted to show a . . . course of performance that is 'consistent' with the express terms; otherwise the terms alone will control."  Id. (internal footnotes omitted).

provisions . . . or limit the contract's effect by a strained construction, even if the resulting

contract would be economically more efficient or advantageous to one or both parties, or more fair

or equitable than the agreement the parties were satisfied to make."  Id. at 303-05 (internal

footnotes omitted); see also Coca-Cola Bottling Co., 769 F. Supp. at 706 ("[A] Court 'must guard

against inadvertently reforming a contract under the guise of construction by looking too intently

for means of bringing about some ultimate good, thwarting an apparent wrong, or preventing

hardship . . . .' " (quoting Coca-Cola Bottling Co. of Elizabethtown, Inc. v. Coca-Cola Co., 654 F.

Supp. 1388, 1397 (D. Del. 1986), aff'd, 988 F.2d 386 (3d Cir. 1993) (internal quotations

omitted)).

> **1.    Modification, Waiver, and/or Equitable Estoppel of Paragraph 11 of the Agreement**[23]

> > **a.    Language of the Agreement**

As outlined above, when the Court interprets an agreement, the evidence entitled to the

greatest weight is the language of the agreement itself.  Here, this Court shall address the relevant

sections of the Agreement.

The "WITNESSETH" section of the Agreement states, in pertinent part:

> WHEREAS, it is the desire of the parties hereto to enter into the within
> agreement so that the business and affairs of the partnership shall be managed and
> directed under a definite and fixed policy and to secure a union of the interests of
> the parties hereto, in and to the said business of the partnership, and that the
> interests of the parties hereto may be best served; and
> WHEREAS, it is the desire of the parties hereto to further provide for
> certain eventualities that may occur in the event of the death of any of the parties
> hereto.

---

[23]For the purposes of coherence, this Court shall address Count Three of Plaintiffs'
Amended Complaint prior to addressing Count Two.

(Wilkinson Aff. ¶ 2, Ex. A at 1.)

Paragraph 2 ("Term") of the Agreement states:

> The partnership shall continue for a period of ten (10) years from February 1st, 1959, and shall continue thereafter, from year to year, unless at least three months before the end of any year either party shall deliver to the other a notice in writing by registered mail, of his intention to dissolve the partnership, at the end of that year.

(Wilkinson Aff. ¶ 2, Ex. A at 2.)

Paragraph 4 ("Profit and Loss") of the Agreement states "[t]he net profits of the partnership shall be divided equally among the parties and the net losses shall be borne equally by them."  (Wilkinson Aff. ¶ 2, Ex. A at 3.)

Subsection (g) of Paragraph 11 of the Agreement provides the parties with a specific means for changing the purchase price of a party's interest in the partnership.  Paragraph 11(g) states in relevant part:

> The parties hereto may, from time to time, by mutual agreement, adjust the purchase price, as hereinabove provided in this paragraph, subdivision "a)" thereof, by affixing to this agreement an instrument in writing, in a form as indicated at the end of this subdivision, which shall be signed by all parties.  Such amendment, or amendments, shall have the same force and effect as if originally contained in the main body of this paragraph at the time of the execution hereof and the purchase price so fixed in the last amendment preceding the death of any of the parties hereto shall be controlling and binding upon the parties hereto, their heirs, executors and administrators. . . . .

(Wilkinson Aff. ¶ 2, Ex. A at 9.)[24]

---

[24]It appears that the language of Paragraph 11(g) provides a mechanism for changing the purchase price of any and all partners' partnership interest by mutual agreement from the date of any such amendment.  However, in practice the parties utilized Paragraph 11(g) to modify the purchase price for individual partners, i.e., Paragraph 11(g) has been invoked several times for

### b.    Course of Conduct

Plaintiffs argue that over the course of more than forty years, the partners modified or waived Paragraph 11 by their "course of conduct."[25]  Namely, Plaintiffs cite the undisputed fact that three retired or deceased partners received more than the $100,000 fixed-sum buyout amount upon dissociation from the partnership, as evidence of a "course of conduct," modifying or waiving Paragraph 11(a).[26]  (Pls.' Br. in Supp. of Mot. for Partial Summ. J. 11.)  Plaintiffs argue

---

successive modifications.  (See Wilkinson Aff. ¶¶ 4-7, Exs. C-F, respectively.)

This Court notes that the document attached by Plaintiffs to Richard D. Wilkinson's affidavit as Exhibit C, is an unsigned copy of a 1967 amendment to the Agreement.  A signed copy of this amendment (also labeled Exhibit C), is attached to Defendant's Response to Plaintiffs' Statement of Undisputed Material Facts at ¶ 9 (hereinafter "Def.'s Ex. C") and to Defendant's Reply Brief at 9-10.

[25]The essence of Plaintiffs' "course of conduct" argument is that Paragraph 11 was modified by the conduct of the parties over the course of more than 40 years because the parties "disregarded" Paragraph 11(a)'s buyout provision, which has resulted in an unenforceable buyout provision.  However, Plaintiffs fail to acknowledge that the parties' "course of conduct" was actually in accordance with the very terms of Paragraph 11.  Plaintiffs' argument is circuitous.  If the partners' "course of conduct" was in accordance with Paragraph 11's mechanism for modifying the buyout provision, then such modifications cannot then constitute a "course of conduct" rendering Paragraph 11 permanently modified, and therefore, unenforceable.

[26]Although Plaintiffs submitted no actual proof of how much money any departing partner or his estate actually received, Defendant does not dispute that the partners who retired or died before Maurice, received more than the $100,000 fixed-sum buyout amount.  It is undisputed that when Louis Laplace died in 1960 his estate received at least $100,000, and potentially more than $100,000, although there is no written evidence of this fact.  (Saniel Dep. Ex. B at 61:17-25; 62:1-25; 63:1-11.)  The parties also do not dispute that Oscar Laplace received at least $139,000 upon his retirement in 1967.  (Saniel Dep. Ex. B at 65:10-19;66:6-17; see also Wilkinson Aff. ¶ 4, Ex. C (the "1967 Amendment."))  Although Defendant does not dispute that Oscar B. Laplace's estate may have ultimately received a payment totaling approximately $230,000 after his death in 1986, Defendant was not able to confirm the actual payment amount to Oscar B. Laplace's estate.  (Saniel Dep. Ex. B at 101:2-6; 102:16-21; 117:25; 118:1-16; 122:3-11.)  Plaintiffs have submitted a written agreement which indicates that Oscar B. Laplace's estate received a payment in excess of $100,000 at the time of the agreement, and additionally, would receive a payment of $500 per week beginning September 15, 1990, and continuing for a period of 260 weeks, up to and including September 9, 1995.  (Wilkinson Aff. ¶ 7, Ex. F (the "1990

that the fact that none of the partners who died or retired prior to Maurice's death received only the $100,000 buyout, demonstrates a "complete disregard for the $100,000 fixed-sum buyout provision" resulting in modification or waiver of the buyout provision.  (Pls.' Br. in Supp. of Mot. for Partial Summ. J. 11.)  Plaintiffs claim that the end result of the parties' modification of Paragraph 11(a) of the Agreement "is a partnership agreement with no fixed-sum buyout provision."  (Pls.' Br. in Supp. of Mot. for Partial Summ. J. 12.)

Alternatively, Plaintiffs argue that the parties waived their right to enforce the buyout provision because they "knowingly departed from the terms of the buyout provision" and "never abided by the buyout provision and, thus, never intended to be bound by it." (Pls.' Br. in Supp. of Mot. for Partial Summ. J. 15.)  Plaintiffs insist that the parties' repeated "waiver" of the buyout provision is further evidenced by their decision to ignore the Agreement's life insurance requirement.[27]  (Pls.' Br. in Supp. of Mot. for Partial Summ. J. 16.)  In sum, Plaintiffs argue that

---

Amendment."))  By Plaintiffs' calculations, this agreement suggests that Oscar B. Laplace's estate ultimately received a payment of more than $230,000.  (Saniel Dep. Ex. B at 118:5-9; 120:18-25; 121:1-21.)  The parties do not dispute the existence of two other written agreements providing buyouts in the amount of $225,000 with 45 day time limits: (1) executed in 1982 when Saniel was hospitalized for bypass surgery; and (2) executed in 1984 when Oscar B. was suffering from heart trouble.  (Saniel Dep. Ex. B at 69:23-25; 70:1-2; 71:4-21; 91:2-22; 93:16-25; 94:1-12; Wilkinson Aff. ¶¶ 5-6, Exs. D-E.)  For the purposes of this Opinion, the various individual agreements will be collectively termed the "Amendments."

[27]Paragraph 11(k) of the Agreement states:

As soon after the execution of this agreement as practical, the partnership will make application for life insurance on the lives of the partners who are insurable.  Each such insurable partner will be insured for the sum of One Hundred Thousand Dollars ($100,000.00), and the policies so issued shall indicate the owner and beneficiary to be the partnership.  It is understood and agreed that in the event of the death of any of the insured partners the proceeds of such insurance shall be received by the partnership and held in trust for the purpose of applying and paying same as payment on account of the purchase price of such

the fact that all deceased or retiring partners received more than $100,000, coupled with the fact

that all of the partners ignored the life insurance requirement,[28] demonstrates that the partners

knowingly and intentionally waived the buyout provision of the Agreement.  (Pls.' Br. in Supp. of

Mot. for Partial Summ. J. 17.)  Plaintiffs urge this Court not to permit Defendant "to now enforce

the very provision that he and all the other Partners chose to ignore for over 40 years merely

because he stands to gain a multimillion dollar windfall by its enforcement as the last surviving

Partner."  (Pls.' Br. in Supp. of Mot. for Partial Summ. J. 17.)

      Defendant contends that the Amendments to the Agreement cannot constitute modification

or waiver of Paragraph 11 because in their construction the Amendments: (1) honored and

recognized the terms of the Agreement; (2) referenced the Agreement and specifically its "buy out

[sic] terms;"[29] and (3) were in writing.[30]  (Def.'s Br. in Opp'n to Pls.' Mot. for Partial Summ. J.

_____

      deceased partner's interest in lieu of the provision for an initial payment of 20%
as provided for in Paragraph 11 (a)(1) hereof.  In such case, the balance (if any) of
the purchase price in excess of the amount of the insurance proceeds, shall be paid
in the same manner and at the same rate as provided in Paragraph 11 (a)(1) for the
payment of the balance after the initial payment.
             In the event the amount of the insurance proceeds received by the
partnership shall be in excess of the then established purchase price, the
partnership shall nevertheless pay the full amount of such insurance proceeds to
the representatives of such deceased partner, as if the amount of such insurance
proceeds had been the amount fixed as the purchase price of such deceased
partner's interest.

(Wilkinson Aff. ¶ 2, Ex. A at 11(a).)

    [28]The only evidence Plaintiffs cite for this proposition is Saniel's deposition testimony
that none of the partners ever satisfied the life insurance requirement.  (Pls.' Br. in Supp. of Mot.
for Partial Summ. J. 17; Saniel Dep. Ex. B at 43:16-18; 49:16-19; 50:16-22.)

    [29]The 1967 Amendment specifically referenced the Agreement, and Article 12 of the
Agreement.  The 1990 Amendment specifically referenced Paragraph 11(a).  Both of the 45 day
time limited Amendments (1982 and 1984), referenced the Agreement.  (See Wilkinson Aff. ¶¶

11.)  In light of these facts, Defendant argues that the only reasonable conclusion from the Amendments is "that the parties were fully aware of the 1959 Agreement and intended to be controlled by said Agreement except as to their modifications which were in writing and signed by all partners."  (Def.'s Br. in Opp'n to Pls.' Mot. for Partial Summ. J. 11.)  Specifically, Defendant argues that Maurice "<u>knew</u> the 1959 buyout provisions were always invoked and always governed **<u>unless</u>** the parties agreed otherwise" because he signed all of the Amendments.  (Def.'s Br. in Opp'n to Pls.' Mot. for Partial Summ. J. 12.)

Defendant contends that there is no evidence that Maurice wanted or expected anything other than for the terms of the Agreement to be enforced.  (Def.'s Br. in Opp'n to Pls.' Mot. for Partial Summ. J. 12.)  Furthermore, Defendant asserts that Maurice knew that the Agreement provides that the surviving partner will be liable "for all of the debts, obligations or liabilities incurred by the partnership."  (Def.'s Br. in Opp'n to Pls.' Mot. for Partial Summ. J. 13.)  In sum, Defendant argues that there is no evidence that Maurice wanted to do anything other than "leave the good and the bad of the partnership to his brother with whom he had been a partner without incident for over 40 years."  (Def.'s Br. in Opp'n to Pls.' Mot. for Partial Summ. J. 13.)  In support of these arguments, Defendant states, "[a]t no time during his life did either Maurice or I take any steps to invalidate the Agreement.  On the contrary, we were both fully aware of its terms

———————————

4-7, Exs. C-F.)

[30]Louis Laplace's "Amendment" excepted, as previously noted.  <u>See</u> <u>supra</u> note 26.  In response to Defendant's arguments, Plaintiffs contend that the fact that the majority of the Amendments were in writing is not relevant, because none of the written Amendments were executed in accordance with Paragraph 11, and therefore, the Amendments actually constitute "an abandonment or disregard" of the Agreement, resulting in its modification.  (Pls.' Reply Br. 5, 7.)

and obligations and were in full agreement with the same." (Saniel Cert. ¶ 11.)[31]

 As stated in the Agreement, it is within the power of the parties to the Agreement to agree to different buyout terms. (Wilkinson Aff. ¶ 2, Ex. A at 9.) Defendant astutely noted that all but one of the Amendments were "written," as permitted by section (g) of Paragraph 11. Plaintiffs did not produce evidence of any other modifications, in writing and agreed to by the parties, to Paragraph 11(a). At a minimum, the evidence Plaintiffs cite to in support of their theories of modification, and waiver, actually demonstrates that the parties adhered to the Agreement, by executing Amendments pursuant to the terms of Paragraph 11(g) of the Agreement.[32] More

_____

 [31]Defendant also argues that as Maurice was diagnosed with cancer over a year before he died that if he was unhappy with the provision he could have requested a change from Defendant. (Def.'s Br. in Opp'n to Pls.' Mot. for Partial Summ. J. 12.) In response, Plaintiffs insist that "the fundamental fact that no Partner who died or retired before Maurice was ever held to the $100,000 buyout price in ¶¶ 11 or 12," strongly supports a waiver of the buyout provision because there "was no reason for Maurice to think he would be saddled with [the buyout provision] either." (Pls.' Reply Br. 6-7.) Furthermore, Plaintiffs argue that Saniel's concession that he and Maurice "never talked about anything to the contrary" resulted in "no 'red flag' to put Maurice on notice that things would be different" when he passed away. (Pls.' Reply Br. 7.)

 [32]Plaintiffs argue that the fact that the 1967 Amendment provided Oscar with $139,000 instead of $100,000, combined with the fact that the Amendment was not written in exact accordance with Paragraph 11(g), demonstrates the Amendment's lack of conformity with Paragraph 11, and the partners' abandonment of the Agreement. (Pls.' Reply Br. 5-6.) Plaintiffs make a similar argument with respect to the 1990 Amendment, namely, that the fact that it provided Oscar B.'s estate with an amount in excess of $230,000, more than four years after Oscar B.'s death, is further evidence of the partners' abandonment of the Agreement. (Pls.' Reply Br. 6.) Regarding the 1982, and 1984, 45 day time limited Amendments, Plaintiffs argue that they were not in keeping with Paragraph 11 because the Paragraph says nothing about temporary changes in value. (Pls.' Reply Br. 6.) Although Plaintiffs direct this Court's attention to the undisputed fact that the 1990 Amendment was made after Oscar B.'s death with the executrix of his estate, Lillian Laplace, nonetheless, the Amendment does state:

 WHEREAS, the partnership has made payment in excess of $100,000.00 to the
 Estate of Oscar B. Laplace by payments to said estate; and
 WHEREAS, the surviving partners do wish to pay to the Estate of Oscar B.
 Laplace, additional sums of money notwithstanding the original agreement dated

important, each individual Amendment or modification did not trigger, by language or reasonable inference, any different treatment of subsequent dissociating partners. Indeed, here, when a partner (or their estate) wanted to change Paragraph 11(a)'s buyout provision, the parties executed a written amendment and all signed the amendment. Thus, the parties acted in accordance with Paragraph 11(g) and their "course of conduct" affirmed, rather than modified, Paragraph 11 of the Agreement. As Plaintiffs have failed to demonstrate a "course of conduct" that would lead this Court to conclude that Paragraph 11(a) of the Agreement was modified or waived, Plaintiffs cannot successfully rebut Defendant's motion. Paragraph 11(a) is not unenforceable on the grounds Plaintiffs propose.[33]

---

August 4, 1959.

(Wilkinson Aff. ¶ 7, Ex. F.)

Yet the Amendment provides no indication regarding *when* such payment was made. This section of the Amendment's language is followed by the partners' agreement to pay Oscar B.'s estate $500.00 per week for approximately five years from the signing of the Amendment. (Wilkinson Aff. ¶ 7, Ex. F.) Despite Plaintiffs' contention that an Amendment made after a partner's death and for a total amount exceeding the $100,000 buyout provision in Paragraph 11 is without question evidence of the partners' abandonment or modification of the Agreement, the Amendments as a whole are sufficiently in accord with Paragraph 11(g) to conclude otherwise. Thus, the Amendments alone do not create a sufficient basis for this Court to determine that Paragraph 11 of the Agreement has been modified or waived by the partners' conduct. Finally, there is no evidence to suggest that Oscar B. owed the partnership any amount of money due to an overdraft in his capital account, whereas here, according to Defendant, Maurice has an overdraft of $261,321 (see supra note 13).

[33]This Court need not address Plaintiffs' equitable estoppel argument as Plaintiffs have failed to establish a "course of conduct" modifying or waiving Paragraph 11 of the Agreement. Nonetheless, this Court directs the parties' attention to Paragraph 2 of the Agreement, which nullifies Plaintiffs' equitable estoppel argument. In accordance with the language of Paragraph 2 of the Agreement, Maurice was fully capable of dissolving the Partnership during his lifetime, but chose not to do so. (Wilkinson Aff. ¶ 2, Ex. A at 2.)

Similarly, this Court need not address Plaintiffs' argument that the partners' failure to purchase $100,000 life insurance policies, as required by the Agreement, demonstrates that the

The parties' arguments aside, the language of the Agreement is clear--at the time the parties entered the Agreement, they intended for the partnership to continue in the event of the death or retirement of a party, and constructed Paragraph 11 with this intention.

Maurice signed each separate and specific Amendment to Paragraph 11, allocating a different buyout amount to that specific partner, in accordance with section (g).  Therefore, Maurice was well aware of the provision, and there is no evidence that he ever wished to alter it for himself.  As noted by Defendant, Maurice was diagnosed with terminal cancer more than a year before his death.  The lack of evidence indicating a desire on his part to change the buyout provision in the face of impending death is telling.  There is no evidence supporting Plaintiffs' assertion.

In contrast, Plaintiffs' (Maurice's wife and daughter) dissatisfaction with Paragraph 11's buyout provision is apparent but the Agreement provides no solace.  Plaintiffs do not dispute that Maurice willingly agreed to, and followed, the tenets of the Agreement, including Paragraph 11, for over 40 years.  Yet, in seeking a monetary gain that was never contemplated by the parties to the Agreement, Plaintiffs would have this Court controvert the intention of the parties.[34]  The clear intention of the parties to the Agreement was for the partnership business to continue, regardless

---

partners chose to ignore (i.e., "modify") the fixed-price buyout provision from the inception of the partnership.

[34]Plaintiffs allege that the other partners received "fair value" for their partnership interests, but present no evidence to support these allegations.  (Am. Compl. ¶ 15.)  For example, Plaintiffs allege that Oscar was paid "his proportional share of what was then perceived as the fair value of LJM and which was greater than the $100,000 set forth in the Agreement."  (Am. Compl. ¶ 15.)  Plaintiffs also allege that Oscar B.'s estate "did receive a payout that was estimated to be consistent with the perceived fair value of the business at that point in time, which was substantially more than the $100,000 set forth in the Agreement."  (Am. Compl. ¶ 15.)

24

of the inevitable changes to the status of the parties to the Agreement.  As Defendant notes, "[a]t

no time during his life did either Maurice or I take any steps to invalidate the Agreement.  On the

contrary, we were both fully aware of its terms and obligations and were in full agreement with

the same."  (Saniel Cert. ¶ 11.)

For the reasons discussed above, this Court finds that Defendant has carried his burden, as

the moving party, and demonstrated that there is no genuine issue as to a material fact for the jury

to resolve with respect to whether the parties modified or waived Paragraph 11 by their "course of

conduct."  Plaintiffs have failed to point to anything in the factual record that creates a genuine

issue of material fact as to the existence of a "course of conduct" modifying or waiving Paragraph

11.  Additionally, as a matter of law, "course of conduct" is not the critical factor for this Court's

consideration in this instance.  Defendant is entitled to summary judgment as a matter of law on

Count Three of Plaintiffs' Amended Complaint.  See FED. R. CIV. P. 56.

### 2.      Scope of the Buyout Provision

LJM's principal place of business is located on Leliart's Lane in Elmwood Park, New

Jersey, on property owned by the partnership.  The LJM office and warehouse facility is located

on one parcel, and the vacant parcel adjacent to the office is used as parking facilities for the

business' trucks.  (Pls.' Statement ¶ 21; Wilkinson Aff. ¶¶ 19-21, Ex. R; Def.'s Br. in Supp. of

Mot. for Summ. J. 8.)

Count Two of Plaintiffs' Amended Complaint alleges that "the $100,000 purchase price

set forth in Paragraph 11 applies by its terms only to a deceased partner's interest in the

'partnership business,' and not to the underlying real estate holdings of LJM."  (Am. Compl. ¶

30.)  Plaintiffs further allege that historically, the partners have treated the partnership business as

25

a separate and distinct asset from the underlying real estate, because they sought to sell the business separate from the real estate before Maurice's death.  (Am. Compl. ¶ 30.)  Finally, Plaintiffs allege that even if the Court finds that the $100,000 buyout provision is enforceable with respect to the partnership business, they "are entitled to recover one-half of the fair value of the [partnership's] underlying real estate as of February 13, 2003."  (Am. Compl. ¶ 31.)

> ### a.   Language of the Agreement

In accordance with the general principles of contract interpretation, the express language of the Agreement must be examined.  The "WITNESSETH" section of the Agreement states, in pertinent part:

> WHEREAS, it is the desire of the parties hereto to enter into the within agreement so that the business and affairs of the partnership shall be managed and directed under a definite and fixed policy and to secure a union of the interests of the parties hereto, in and to the said business of the partnership, and that the interests of the parties hereto may be best served; and
>
> WHEREAS, it is the desire of the parties hereto to further provide for certain eventualities that may occur in the event of the death of any of the parties hereto.

(Wilkinson Aff. ¶ 2, Ex. A at 1.)

Paragraph 7 of the Agreement ("Management Duties and Restrictions") states in relevant part:

> None of the parties shall, except with the consent of the other parties, assign, mortgage or sell his share in the partnership, or in its capital assets, or property, or enter into any agreement as a result of which any person shall become interested with him in the partnership, or do any act detrimental to the best interests of the partnership, or which would make it impossible to carry on the ordinary business of the partnership.

(Wilkinson Aff. ¶ 2, Ex. A at 4.)

Paragraph 11 of the Agreement states in relevant part:

> In the event of the death of any of the parties hereto, during the term of this agreement and the continuance of the partnership, the surviving parties shall purchase from the estate of such deceased party, and the estate of such deceased party shall sell to the surviving parties, the interest of such deceased party in and to the partnership business, at a price and under terms and conditions as hereinafter provided for:

> a)  Notwithstanding any value of the capital account, or the value of the capital account plus accrued profits to the date of death of such deceased party, as same may be reflected by the books of the partnership, the surviving parties shall pay to the estate of the deceased party, and the estate of th e [sic] deceased party shall accept as payment in full and as the purchase price for such deceased party's interest in the partnership, the sum of $100,000.00, subject to the adjustment hereinafter provided [as set forth in 11(b)] . . . .

(Wilkinson Aff. ¶ 2, Ex. A at 5-6.)

### 1.      Amendments to the Agreement

In the 1967 written Amendment (created for Oscar's retirement from the partnership), Oscar specifically agreed "to execute simultaneously with this Agreement, an Assignment or Assignments of any and all assets of the Partnership which shall require a separate assignment for transfer and this Agreement shall likewise amount to a transfer of these assets."  (Wilkinson Aff. ¶ 4, Ex. C at 2; see also Def.'s Ex. C.)  Oscar further agreed that:

> [H]e will, from time to time, execute, if necessary, any assignment for such item or items which may have inadvertently been excluded from this Agreement and from the separate assignments executed at this time - namely:

> . . .

> 4.      Property on Leliart's Lane, East Paterson, New Jersey, as described in Deed dated April 5th, 1967, from James Curlee and Dorothy Curlee, his wife, and recorded on April 6th, 1967 in Book 5029, page 430, in the Office of

the Bergen County Clerk.

. . . .

(Wilkinson Aff. ¶ 4, Ex. C at 2-3; <u>see also</u> Def.'s Ex. C.)

Similarly, Oscar B.'s 1990 written Amendment to the Agreement transferred "any interest [his estate] might have in the partnership and the partnership assets to Maurice L. Laplace and Saniel Laplace," and released any interest or claims of his estate.  (Wilkinson Aff. ¶ 7, Ex. F at ¶ 1.)

### 2.    RUPA's Definition of Partnership Interest

RUPA defines "[p]artnership interest" or "partner's interest in the partnership" to mean "all of a partner's interests in the partnership, including the partner's transferable interest and all management and other rights."  N.J. STAT. ANN. § 42:1A-2 (2005).  Under the statute, "[p]roperty" means "all property, real, personal, or mixed, tangible or intangible, or any interest therein."  <u>Id.</u>  RUPA specifically states that "[p]roperty is partnership property if acquired in the name of . . . the partnership . . . ."  N.J. STAT. ANN. § 42:1A-12(a)(1) (2005).  It is undisputed that the 1967 deed transferred to the partnership real estate from James and Dorothy Curlee to Oscar, Maurice, Oscar B., and Saniel Laplace as a, "Partnership trading under the name of L.J. & M. Laplace" (e.g., the deed was executed in the name of the partnership).  (Wilkinson Aff. ¶ 19, Ex. R.)

### b.    The Partnership's Underlying Real Estate

The parties do not dispute that the partnership's underlying real estate at Leliart's Lane houses the partnership warehouse, offices, and parking facilities for its trucks.  (Def.'s Br. in Supp. of Mot. for Summ. J. 8.)  They also do not dispute that the property is, and was, actually

28

used in the operation of the business.  (Def.'s Br. in Supp. of Mot. for Summ. J. 8.)  Defendant

argues that the property is partnership property because: (1) it was acquired in the name of the

partnership; and (2) property acquired in the name of a partnership is considered partnership

property under RUPA.  In addition, Defendant argues that if the parties had intended for the

underlying real estate to be excluded from a "party's interest in the partnership," they would have

memorialized their intention in the Agreement.  (Def.'s Br. in Opp'n to Pls.' Mot. for Partial

Summ. J. 16.)

     Plaintiffs do not dispute that the partnership's underlying real estate would likely be

considered "partnership property" under RUPA.  (Pls.' Br. in Supp. of Mot. for Partial Summ. J.

33; Pls.' Reply Br. 9.)  Instead, Plaintiffs argue that this fact is irrelevant because the partners

were still free to decide to separate the value of the property from the value of the operating

business, for the purposes of the buyout provision (e.g., "define the buyout however they

wished").  (Pls.' Br. in Supp. of Mot. for Partial Summ. J. 33-34; Pls.' Reply Br. 9.)  In addition,

Plaintiffs argue that RUPA sheds no light on this issue because the statute does not define the

term "partnership business," and the term "partnership interest" was not defined by the statute

when the Agreement was signed.  (Pls.' Br. in Supp. of Mot. for Partial Summ. J. 31, n. 8.)

     Plaintiffs further argue that even if the buyout provision is held enforceable, it would apply

only to LJM's operating business and not its underlying real estate because the buyout provision

refers to the "partnership business," not to all of the "partnership property."  (Pls.' Br. in Supp. of

Mot. for Partial Summ. J. 30-31.)  In sum, Plaintiffs argue that because the term "partnership

business" is not specifically defined in the Agreement, the contractual language of the Agreement

limits the $100,000 buyout price to a deceased partner's interest in the operating business of LJM,

as distinct from the underlying real estate.  (Pls.' Br. in Supp. of Mot. for Partial Summ. J. 31;

Pls.' Reply Br. 9.)

At the very least, Plaintiffs argue that this Court should consider extrinsic evidence of the

parties' "course of conduct" in determining the Agreement's true meaning and intention.  (Pls.'

Br. in Supp. of Mot. for Partial Summ. J. 32.)  Specifically, Plaintiffs assert that the parties'

"course of conduct" conclusively demonstrates that they regarded the operating business of LJM

as an asset separate from the underlying real estate, because prior to Maurice's death, Saniel and

Maurice took steps to market the operating business separate from the real estate (e.g., the

property was listed with a real estate broker).  (Pls.' Br. in Supp. of Mot. for Partial Summ. J. 32-

33.)  Plaintiffs argue that the parties' treatment of the operating business and the real estate as

separate assets *prior* to Maurice's death, and Defendant's continued separate treatment of those

assets *after* Maurice's death, conclusively show that the "partnership business" in Paragraph 11 of

the Agreement was intended to encompass only the operating business, and not the underlying

real estate.  (Pls.' Br. in Supp. of Mot. for Partial Summ. J. 33.)

In response, Defendant argues that real estate in the name of a partnership is generally

regarded as personal property of the partnership, and furthermore, that if the real estate was

intended to be excluded from the buyout purchase price, there would have been a clear indication

in the Agreement.  (Def.'s Br. in Opp'n to Pls.' Mot. for Partial Summ. J. 16.)  Defendant also

argues that there is nothing in the law or the Agreement which prevented the partners from selling

an asset of the partnership independent of the partnership as a whole, at any time, and that this

proposition does not amount to proof that the partners did not intend for the Agreement to govern

all of the partnership's assets.  (Def.'s Br. in Opp'n to Pls.' Mot. for Partial Summ. J. 18.)

30

Defendant further argues that RUPA's definition of partnership interest would include the underlying real estate of the partnership.  (Def.'s Br. in Opp'n to Pls.' Mot. for Partial Summ. J. 17.)

Finally, Defendant points to the buyout agreements made with Oscar and Oscar B., which both clearly reference Paragraph 11 or 12 of the Agreement, and discuss the buyout of the entire partnership interest with no distinction for the partnership's underlying real estate.  (Def.'s Br. in Opp'n to Pls.' Mot. for Partial Summ. J. 17.)  Defendant notes that Oscar's retirement agreement specifically assigned all of the property listed.  (Def.'s Br. in Opp'n to Pls.' Mot. for Partial Summ. J. 17; Wilkinson Aff. ¶ 4, Ex. C; see also Def.'s Ex. C.)

The express language of the Agreement as outlined above, demonstrates the parties' intention to create a partnership that would: (1) survive the eventual death of the parties to the Agreement; and (2) serve the best interests of the partnership.  In light of the parties' specific intentions, a plain reading of the Agreement results in a "party's interest in the partnership," as including the partnership's underlying real estate.  Therefore, the term "partnership business," as used in the buyout provision in Paragraph 11(a), incorporates both LJM's operating business and underlying real estate.[35]

---

[35]The parties are correct in stating that the Agreement does not define "partnership business" or "party's interest in the partnership."  In light of section 4(a) of RUPA, to the extent that the Agreement does not otherwise provide, RUPA governs the relations of the partners. Here, the Agreement did not define the meaning of a partner's interest in the partnership.  Thus, RUPA's definition of "partnership interest" or "partner's interest in the partnership" would apply to the Agreement.  In accordance with the statute, Paragraph 11's buyout provision would encompass "all of a partner's interests in the partnership, including the partner's transferable interest and all management and other rights."  N.J. STAT. ANN. § 42:1A-2 (2005).  Thus, the statute affirms Defendant's argument that there should be no distinction between the partnership's operating business and underlying real estate.

31

In addition, the 1967 and 1990 Amendments lend further support to Defendant's argument that the parties' intention was to include the partnership's operating business and underlying real estate within a " party's interest in the partnership."  Both Amendments transferred any interest the departing partners or their estates may have had, to the remaining partners.  The 1967 Amendment specifically assigned the rights to the property at Leilart's Lane to Maurice, Saniel, and Oscar B. Laplace "as the Continuing Partners."  (Wilkinson Aff. ¶ 4, Ex. C; see also Def.'s Ex. C.)

For the reasons discussed above, this Court finds that Defendant has carried his burden as the moving party and demonstrated that there is no genuine issue as to a material fact for the jury to resolve with respect to the scope of the buyout provision.  Plaintiffs have failed to point to anything in the factual record that creates a genuine issue as to a material fact regarding whether the terms "partnership business," as used in Paragraph 11(a) or a "party's interest in the partnership" distinguish between the partnership's operating business and underlying real estate. Defendant is entitled to summary judgment as a matter of law on Count Two of Plaintiffs' Amended Complaint.  See FED. R. CIV. P. 56.

## CONCLUSION

Summary judgment is appropriate where the moving party establishes that "there is no genuine issue as to any material fact and that [it] is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c).  On August 26, 2005, Magistrate Judge Haneke issued a R&R, pursuant to FED. R. CIV. P. 72(b) and L. CIV. R. 72.1(a)(2).  A magistrate judge's recommended disposition of a dispositive motion is subject to de novo review.  In re U.S. Healthcare, 159 F.3d 142, 145-46 (3d Cir. 1998); Temptations, Inc. v. Wager, 26 F. Supp. 2d 740, 743 (D.N.J. 1998).  After de novo

review of Magistrate Judge Haneke's R&R, the subsequent objections of the parties, and their submissions, this Court finds:

(1) Defendant has carried his burden as the moving party and demonstrated that there is no genuine issue as to a material fact for the jury to resolve with respect to the applicability of RUPA to the buyout provision in Paragraph 11 of the Agreement.  Thus, this Court grants Defendant summary judgment on Count One of Plaintiffs' Amended Complaint;

(2) Defendant has carried his burden as the moving party and demonstrated that there is no genuine issue as to a material fact for the jury to resolve with respect to whether the parties modified or waived Paragraph 11 by their "course of conduct."  Thus, this Court grants Defendant summary judgment on Count Three of Plaintiffs' Amended Complaint; and

(3) Defendant has carried his burden as the moving party and demonstrated that there is no genuine issue as to a material fact for the jury to resolve with respect to the scope of the buyout provision.  Thus, this Court grants Defendant summary judgment on Count Two of Plaintiffs' Amended Complaint.

For the reasons set forth above, Defendant's motion for summary judgment is granted, and Plaintiffs' motion for partial summary judgment is denied.


Dated: January 11, 2006


          S/Joseph A. Greenaway, Jr.       
          JOSEPH A. GREENAWAY, JR., U.S.D.J.